<span style="color:red">**Exhibit 3**</span>

# Venezuela 2024 Human Rights Report

## Executive Summary

The human rights situation in Venezuela significantly worsened.  Throughout the year, and particularly after the July 28 presidential election, Nicolás Maduro and his representatives engaged in serious human rights abuses, reaching "a new milestone in the degradation of the rule of law" after the election, according to the UN Independent International Fact-Finding Mission on the country in September.

Significant human rights issues included credible reports of:  arbitrary or unlawful killings; disappearances; torture or cruel, inhuman, or degrading treatment or punishment; arbitrary arrest or detention; transnational repression against individuals in another country; unlawful recruitment or use of children by Maduro-supported groups in armed conflict; serious restrictions on freedom of expression and media freedom, including violence or threats of violence against journalists, unjustified arrests or prosecutions of journalists, and censorship; trafficking in persons, including forced labor; prohibiting independent trade unions or significant or systematic restrictions on workers' freedom of association; violence or threats against labor activists or union members; and significant presence of any of the worst forms of child labor.

No credible steps or actions were taken to identify and punish officials who committed human rights abuses.

There were reports nonstate armed groups and criminal gangs engaged in violence, human trafficking, exploitation of Indigenous communities, sexual violence, and recruitment or use of children in illicit activities using force, fraud, or coercion.  No action was taken to investigate or prosecute the abuses.

# Section 1. Life

## a. Extrajudicial Killings

There were numerous reports Maduro agents committed arbitrary or unlawful killings.  Although Maduro representatives did not release statistics on the killings, nongovernmental organizations (NGOs) reported national, state, and municipal police entities, as well as the armed forces and *colectivos* (Maduro-aligned armed neighborhood gangs), carried out hundreds of killings during the year.

The NGO Monitor of the Use of Lethal Force (MUFLVEN) recorded 361 deaths involving security forces from January 1 to August 22.  MUFLVEN reported the Bolivarian National Police (PNB) was involved in the largest percentage of cases, closely followed by the Scientific, Penal, and Criminal Investigative Corps (CICPC), the armed forces, and regional and local police.

MUFLVEN assessed that while the number of alleged arbitrary killings decreased sharply compared with 2023, this did not correspond to a decrease in the use of lethal force by Maduro-aligned security forces.

The NGO Venezuelan Education-Action Program on Human Rights (Provea) documented 25 presumed extrajudicial killings related to protests after the July 28 presidential election.  According to Provea, paramilitary groups were responsible for 40 percent of the killings, followed by the military with 28 percent, the Directorate of Strategic and Tactical Actions with 8 percent, and state police forces and unidentified perpetrators with 24 percent.

In October, the UN Independent International Fact-Finding Mission on the Bolivarian Republic of Venezuela (FFM) stated that at least 25 deaths occurred during the first days of protests after the July 28 election, including two children, all but one of whom died of gunshot wounds.  The FFM concluded that in at least eight cases, members of state security forces and groups linked to Maduro used firearms during the protests.

According to NGOs, security forces characterized most killings as confrontations with alleged criminals.  MUFLVEN, however, stated most deaths at the hands of security forces occurred as a result of their arbitrary and disproportionate use of force.

On October 23, the opposition Voluntad Popular (Popular Will) political party alleged regime responsibility for the death of the party's Apure State

cofounder Edwin Santos, whose body was found by the side of a road two days after witnesses saw him detained by Maduro's security forces.  Party representatives blamed Santos's death on Maduro, Apure Governor Wilmer Rodríguez, Paez Mayor Jose "Chema" Romero, the Bolivarian National Intelligence Service (SEBIN), and the Directorate-General of Military Counterintelligence (DGCIM).  On October 25, CICPC Director Douglas Rico claimed Santos died in a motorcycle accident, disregarding contrary statements from the democratic opposition and human rights defenders. Maduro's minister of interior Diosdado Cabello Rondón and Rico said the CICPC would summon and question "everyone who said there were eyewitnesses to the kidnapping of Edwin Santos."  CICPC authorities warned media outlets regarding punishments for "spreading misinformation" concerning the case.

## b. Coercion in Population Control

There were no reports of coerced abortion or involuntary sterilization on the part of Maduro representatives.

# Section 2. Liberty

## a. Freedom of the Press

The law provided for freedom of expression, including for members of the press and other media, but this freedom was significantly restricted due to

laws and regulations governing libel, slander, and media content; legal harassment, physical intimidation of individuals and media outlets; and Maduro's undue influence on the judiciary.  National and international groups condemned Maduro's efforts to restrict press freedom and create a climate of fear and self-censorship.

The law against hate stipulated prison sentences of up to 20 years.  While the stated purpose of the law was to "promote peace and tolerance," NGOs observed the vaguely written law was used to silence activists and journalists and limit freedom of expression.  The law was also used to limit the rights of activists and journalists following their release from prison by banning international travel and requiring regular court appearances.  The Office of the UN High Commissioner for Human Rights (OHCHR) documented 12 cases of individuals, including human rights defenders and journalists, charged or prosecuted under the law from May 2023 to April.

## Physical Attacks, Imprisonment, and Pressure

Pro-Maduro national and state leaders and other figures harassed and intimidated privately owned and democratic opposition-oriented television stations, media outlets, and journalists by using threats, property seizures, administrative and criminal investigations, and prosecutions.  Maduro and his United Socialist Party of Venezuela (PSUV) used the nearly 600 PSUV-aligned media outlets to intimidate the political opposition.  Diosdado Cabello used his weekly television program to threaten individual journalists

and media outlets.

On April 15, SEBIN agents detained journalist Carlos Julio Rojas. Maduro's attorney general Tarek William Saab accused Rojas of being part of a plot to assassinate Maduro. According to Saab, Rojas allegedly coordinated with María Corina Machado and her opposition Vente Venezuela party to attack Maduro on March 25 while Maduro was officially registering as a candidate for the July 28 presidential election. Rojas was charged with association and instigation to commit a crime, terrorism, conspiracy, and attempted assassination.

The NGO Espacio Público registered 98 cases of abuses of freedom of expression in the months preceding the July 28 presidential election, the most recorded since it began collecting data in 2009. Most cases were related to restrictions on journalistic coverage of the election, threats from high-ranking Maduro representatives, and arbitrary arrests in retaliation for expressing opinions critical of Maduro and his representatives or disseminating information Maduro and his representatives supposedly did not want the public to know.

Between July 29 and August 4, the NGO Instituto Prensa y Sociedad de Venezuela (Press and Society Institute of Venezuela, or IPYS) reported 79 violations of freedom of expression, including 62 cases related to coverage of the July 28 presidential election and subsequent prodemocracy demonstrations. IPYS reported senior Maduro representatives accused

independent press covering the protests of committing serious crimes such as inciting hatred.

On August 15, the Inter-American Commission on Human Rights and its Office of the Special Rapporteur for Freedom of Expression reported that since July 28, approximately 108 cases of abuses of freedom of expression were recorded.  They highlighted the arbitrary detention of journalists and press workers on unfounded charges of incitement of hatred and terrorism, cancellation of journalists' passports, closure of media outlets, and confiscation of media equipment.

The NGO Inter-American Press Association categorized the country as "without freedom of expression" in its *Chapultepec Index* for August 2, 2023, to August 1, 2024.  The association cited attacks by security forces against journalists and citizens and increased pressure on television and radio outlets as reasons for their conclusion that during the period covered, "Venezuela suffered a setback in its already deteriorated media ecosystem and to the detriment of citizens' confidence in expressing their ideas, both in the field of street protests and in the use of social networks."

## Censorship by Governments, Military, Intelligence, or Police Forces, Criminal Groups, or Armed Extremist or Rebel Groups

The law provided that inaccurate reporting deemed to disturb the public peace was punishable by prison terms of two to five years.  NGOs noted the

requirement that media disseminate only "true" information was undefined and open to politically motivated interpretation.

The law declared telecommunications a "public interest service," thereby giving Maduro-aligned representatives authority to regulate the content and structure of radio, television, and audiovisual production sectors. The law stipulated licenses could be suspended or revoked when such actions were judged necessary in the interests of the nation, public order, or security. The law empowered Maduro representatives to impose heavy fines and cancel broadcasts for violations of its norms; telecom regulator National Telecommunications Commission (CONATEL) oversaw the law's application.

NGOs noted Maduro representatives' preference for using bureaucratic delays, legal proceedings, financial sanctions, and administrative actions against unfavorable news outlets instead of attempting to close them outright. Maduro representatives also exercised control over content through licensing and broadcasting requirements. To limit the use of radio space by media not aligned with Maduro, CONATEL acted selectively on private radio and television broadcasters' applications to renew their broadcast frequencies.

Maduro-aligned figures controlled a large portion of businesses and paid for advertising only with Maduro-friendly media. Maduro-aligned and -influenced media provided almost continuous pro-Maduro programming. In addition, private and public radio and television stations were required to

transmit mandatory nationwide broadcasts throughout the year, including a daily 15-minute news broadcast that provided reports and summaries of Maduro representatives' activities.

On March 4, Maduro barred German television channel Deutsche Welle (DW) from all cable service companies in the country, accusing DW of disseminating and promoting hate propaganda. On his weekly television show *Con Maduro +*, Maduro accused international media outlets, including DW, CNN, and the Associated Press, of engaging in a campaign to smear him in their reporting regarding the Tren de Aragua foreign terrorist organization. Members of independent media and human rights activists who limited or ceased their activities said they regularly engaged in self-censorship due to fear of reprisals. Many journalists posted articles to their personal blogs and websites instead of publishing them in traditional media.

Espacio Público recorded 17 independent radio station closures from January to July. On June 8, the NGO reported CONATEL closed the radio station La Vernácula 88.3 FM based in Guarico State. The station's transmission equipment was also confiscated. Journalist and radio host Alexander Mataban claimed the measure came in retaliation for reporting on opposition leader María Corina Machado's visit to the state.

According to IPYS, more than five million citizens lived in "media deserts" or "silenced zones," areas where access to information was insufficient. Access to information was most heavily restricted in border territories and areas

where Indigenous communities resided.  These areas also faced greater internet restrictions.

Widespread violence in the country, often encouraged or left undeterred by Maduro and his representatives, made it difficult to determine whether attacks on journalists resulted from common criminal activity or whether criminals or others targeted media members as a form of censorship.  IPYS stated journalists faced higher risks in border areas due to the presence of criminal groups.

On October 28, media reported pro-Maduro individuals used online platforms such as Telegram and WhatsApp to direct threats of intimidation and harassment at perceived Maduro dissidents in a campaign known as Operación Tun Tun (Operation Knock Knock).  According to media, individuals were forced to expose the identities and personal information of persons whom security personnel intended to detain.

## b. Worker Rights

### Freedom of Association and Collective Bargaining

The law provided for the right for workers (except members of the armed forces) to form unions, collectively bargain, and conduct legal strikes.  The law placed several restrictions on these rights, and Maduro representatives deployed a variety of mechanisms to undercut the rights of independent

workers and unions.  There was no effective enforcement of the laws to protect workers' right to form independent unions and collectively bargain.

Forming a company union required a minimum of 20 workers; forming a professional, industrial, or sectoral union in one jurisdiction required 40 workers in the same field; and forming a regional or national union required 150 workers.  Some labor activists viewed these requirements as prohibitively high, particularly for small and medium-sized businesses.  To form an employee association, a parallel type of representation endorsed and openly supported by Maduro representatives required only 10 persons. Employee associations did not have the right to collectively bargain or strike.

The law prohibited "any act of discrimination or interference contrary to the exercise" of workers' right to unionize.  Maduro representatives did not effectively enforce the law.  The law required all unions to provide Maduro's Ministry of Labor with a membership roster that included the full name, home address, telephone number, and national identification number for each union member.  The ministry reviewed the registration and determined whether the union fulfilled all requirements.  The law required the presence of labor inspectors from the ministry to witness and legitimize unions' decisions.

By law, employers could negotiate a collective contract only with unions that represented most of their workers.  Minority organizations could not jointly negotiate in cases where no union represented an absolute majority.

The law also restricted unions' ability to administer their activities. For example, the National Electoral Council (CNE) had the authority to administer internal elections of labor unions, federations, and confederations. By law, elections were required to be held at least every three years. If CNE-administered- and -certified elections were not held within this period, the law prohibited union leaders from representing workers in negotiations or engaging in anything beyond administrative tasks.

The International Labor Organization (ILO) raised concerns regarding the Labor Ministry's refusal to register independent trade union organizations. Organized labor activists reported the annual requirement to provide the ministry a membership roster was onerous and infringed on freedom of association. They alleged the ministry removed member names from the rosters for political purposes, particularly if members were not registered voters on the CNE's rolls. Labor leaders also criticized the laborious and costly administrative process of requesting CNE approval for elections and subsequent delays in the CNE's recognition of such union processes.

Labor unions in both the private and public sectors noted long delays in obtaining CNE concurrence to hold elections and in receiving certification of the election results, which hindered unions' ability to bargain collectively. The ILO found previous cases of interference by the CNE in trade union elections and, since 1999, called for delinking the CNE from the union election process.

The law recognized the right of all public- and private-sector workers to strike, subject to conditions established by law.  The law provided workers participating in legal strikes immunity from prosecution and specified their time in service could not be reduced by the time engaged in a strike, but workers in state-owned companies who engaged in a strike or who called out civil and political rights violations in addition to calling for better working conditions were more likely to be subject to detention and prosecution.  The law required employers to reincorporate striking workers after the conclusion of a strike and provided for prison terms to deter violations for employers who failed to do so.  This law was not enforced.

The law also restricted the right to strike.  It prohibited striking workers from paralyzing the production or provision of essential public goods and services but defined essential services more broadly than ILO standards.  The ILO called for the law to be amended to exclude from the definition of essential services activities "that are not essential in the strict sense of the term…so that in no event may criminal sanctions be imposed in cases of peaceful strikes."

Other legal provisions established criminal penalties for exercising the right to strike in certain circumstances.  For example, anyone who "organizes, supports, or instigates the realization of activities within security zones that are intended to disturb or affect the organization and functioning of military installations, public services, industries and basic enterprises, or the

socioeconomic life of the country" could be punished with five to 10 years in prison.  The law also provided for prison terms for those who restricted the distribution of goods and "those…who develop or carry out actions or omissions that impede, either directly or indirectly, the production, manufacture, import, storing, transport, distribution, and commercialization of goods."

Maduro representatives restricted the freedom of association and the right to collective bargaining through administrative and legal mechanisms.  They continued to support "parallel" unions and employee associations, which sought to dilute the membership and effectiveness of traditional independent unions.  Maduro representatives excluded some independent union federations, including the National Union of Workers of Venezuela and the Confederation of Autonomous Trade Unions, from certain negotiations.  Penalties for violations of laws on freedom of association and collective bargaining were less than those for analogous violations such as civil rights violations.  Penalties were rarely applied against violators.

On January 17, security forces detained Professor Víctor Venegas, president of the National Federation of Education Unions and Schools of Venezuela, at the organization's headquarters in Barinas State.  Maduro's attorney general Saab accused Venegas of ties to an alleged conspiracy to commit acts of violence in Barinas.  The Confederation of Workers of Venezuela asked the ILO to intervene to ensure Venegas's rights were respected.  Venegas was

conditionally released on March 11 but was prohibited from leaving the country and was required to appear before a court every 30 days.

On February 13, the confederation denounced what it described as a systematic policy of trade union persecution by Maduro's Office of the Attorney General and the judiciary, resulting in the criminalization of trade union activity and labor protests in the country.

After the July 28 presidential election, unions reported Maduro representatives harassed workers who were perceived to have voted for the democratic opposition or who abstained from voting. Maduro representatives also reportedly harassed workers who used social media to make statements in support of the democratic opposition or criticizing Maduro. Some workers were reportedly forced to retire or were fired. Media denounced dismissals and forced resignations in state institutions and companies, including Petróleos de Venezuela S.A., the National Electrical Corporation, the television station VTV, and Radio Nacional de Venezuela, as well as in the health sector.

On August 9, Robert Franco, secretary general of the Carúpano branch of the Teachers Union in Sucre State, was sentenced to 30 years in prison for the crimes of treason, association to commit a crime, and attempted homicide. Relatives stated Franco was innocent and was targeted and assigned fabricated charges simply for being a union leader who defended workers' rights.

## Forced or Compulsory Labor

See the Department of State's annual *Trafficking in Persons Report* at
https://www.state.gov/trafficking-in-persons-report/.

## Acceptable Work Conditions

### Wage and Hour Laws

The law provided for a minimum wage for all sectors.  The national
minimum wage was below the poverty line.  Minimum wage and other
benefits were established through decrees.

The law set the workweek at 40 hours (35 hours for a night shift).  The law
established separate limits for "shift workers," who could not work more
than an average of 42 hours per week during an eight-week period, with
overtime capped at 100 hours annually.  Managers were prohibited from
obligating employees to work additional time, and workers had the right to
two consecutive days off each week.

Workers organizations reported delays in the public electronic wage
payment system made it difficult for workers to withdraw the full value of
their wages in cash.

The OHCHR reported that in January, public-sector employees protested
nationwide to call for improved working conditions and a dignified living
wage.  Many protesters said that because inflation eroded their purchasing

power, contributed to growing levels of poverty, and made it difficult for them to afford essential goods, they had to find other sources of income to survive and to provide for their families.

**Occupational Safety and Health**

Workplaces were required to maintain "protection for the health and life of the workers against all dangerous working conditions," but occupational safety and health (OSH) standards were not appropriate for the main industries.  There was no public information available as to whether inspectors proactively identified unsafe conditions or responded to workers complaints.  Workers could legally remove themselves from unsafe situations without jeopardizing their employment, although there were no reports of workers doing this in practice.  The law obligated employers to pay workers specified amounts for workplace injuries or occupational illnesses, ranging from two times the daily salary for missed workdays to several years' salary for permanent injuries.

Media reported the continued deterioration of oil refineries due to lack of maintenance, which led to accidents that contaminated the environment and affected workers' safety.  Unions and democratic opposition leaders frequently reported these accidents, but Maduro representatives usually linked them to "sabotage" or "criminal actions."

Conditions in the mining sector were especially perilous.  NGOs and media

reported hazardous conditions in mines, many of which operated illegally and exposed miners to injury, disease, and mercury poisoning.

**Wage, Hour, and OSH Enforcement**

The law covered all workers, including temporary, occasional, and domestic workers.  Maduro's Ministry of Labor reportedly enforced minimum wage rates and hours of work provisions in the formal sector to some extent, but OSH law was not effectively enforced.  Penalties for wage, hour, and OSH law violations were less than those for similar crimes such as fraud or negligence.  Penalties were rarely applied against violators.  There were various administrative agencies tasked with verifying workplaces complied with OSH regulations.

There was no publicly available information regarding the number of inspectors, their authorities to make unannounced inspections and initiate sanctions, or the frequency of inspections to implement minimum wage, overtime, and OSH laws.  Official statistics regarding workplace deaths and injuries were not publicly available.

An estimated 47 percent of the population worked in the informal sector, according to a 2022 report from the Andres Bello Catholic University.  Labor law and protections generally were not enforced in this sector.

## c. Disappearance and Abduction

### Disappearance

There were reports of enforced disappearances by or on behalf of Maduro representatives.  In April, the UN Working Group on Enforced or Involuntary Disappearances denounced an "alarming increase" since December 2023 in enforced disappearances of citizens exercising their rights to freedom of expression and association and participating in matters of public interest.

Between July 28 and September 15, domestic civil society organizations registered at least 1,808 persons detained in relation to postelection protests.  They stated detainees were often transferred to detention centers without their families being informed of their whereabouts or physical condition.  They also received reports of enforced disappearances of short duration during which victims were allegedly subjected to sexual violence and other acts that could constitute torture.

Between July 29 and August 1, Provea documented at least 50 cases characterized as enforced disappearances, with most victims being detained by SEBIN, the DGCIM, the Directorate of Strategic and Tactical Actions, and PNB agents or armed colectivos.

### Prolonged Detention without Charges

The constitution prohibited the arrest or detention of an individual without

a judicial order and provided for the accused to remain free during trial, but judges and prosecutors often disregarded these provisions.  Detainees were rarely granted the ability to challenge the lawfulness of their detentions in court, even though the right to do so was stipulated by law.

Prolonged pretrial detention was a significant problem.  The law stated a person accused of a crime could not be detained for longer than the possible minimum sentence for that crime or for longer than two years, whichever was shorter, except in certain circumstances, such as when the defendant was responsible for the delay in the proceedings.  Maduro representatives routinely ignored these requirements.  Due to overcrowding in prisons, many police station offices were used as makeshift prison cells.  Long delays in court proceedings and prison transfers caused some prisoners to be held in these facilities for years.

Despite constitutional protections that provided for timely trials, judges reportedly scheduled initial hearings months after the events that led to the detention.  Proceedings were often deferred or suspended when an officer of the court, such as the prosecutor, public defender, or judge, failed to attend.  Prisoners reported to NGOs that disorganization in the prison system and a lack of transportation reduced their access to the courts and contributed to trial delays.  The OHCHR observed further delays in the issuance and execution of release orders.  The OHCHR identified 10 detainees who remained in detention after completing their sentences and

with no order for their release being issued.

## d. Violations in Religious Freedom

See the Department of State's annual *International Religious Freedom Report* at https://www.state.gov/international-religious-freedom-reports/.

## e. Trafficking in Persons

See the Department of State's annual *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

# Section 3. Security of the Person

## a. Torture and Cruel, Inhuman, or Degrading Treatment or Punishment

Although the constitution and law prohibited such practices, there were credible reports Maduro-aligned security forces regularly tortured and abused detainees.

Maduro's Office of the Human Rights Ombudsman did not publish statistics regarding allegations of torture by police during the year.  Several NGOs reported cases of torture and cruel, inhuman, and degrading treatment. Human rights groups reported Maduro representatives continued to influence the attorney general and public defenders to conduct

investigations selectively and subjectively.  The domestic human rights NGOs Foro Penal (Penal Forum) and Coalición por los Derechos Humanos y la Democracia (Coalition for Human Rights and Democracy) maintained hundreds of cases of torture were not reported because victims feared reprisal.

Some detainees and their relatives reported receiving death threats. Detainees reported Maduro-controlled security forces moved them from detention centers to houses and other clandestine locations where abuse took place.  Cruel treatment frequently involved denying prisoners medical care and holding them for long periods in solitary confinement.  NGOs reported security forces subjected some detainees to sexual violence.

In prisons, women were targeted for sexual violence, abuse, and torture and were frequently coerced into sexual acts in exchange for food or water. NGOs reported guards knew of and tolerated these abuses and sometimes facilitated them or committed these abuses themselves.  NGOs reported instances of inmates and family members being threatened if they reported abuses.

In June, the OHCHR reported 10 individuals detained by SEBIN and DGCIM agents were tortured or mistreated.  In August, the Coalition for Human Rights and Democracy reported Juan Hidalgo Rodríguez, arrested on July 30 in Carabobo State, was in poor health after being tortured and as a result needed urgent medical attention.

The NGO Casla Institute for the Study of Latin America reported security forces engaged in torture.  The institute stated it documented 16 incidents of torture between January 2023 and April involving at least 35 victims that were reportedly committed by the DGCIM, SEBIN, PNB, and the National Guard.  The report described psychological torture, sexual violence, severe beatings, and electric shocks, among other forms of mistreatment allegedly used by security forces.  The institute reported the incidents to the International Criminal Court, which was carrying out its own investigation.

Media reported Maduro promoted military officers involved in human rights abuses.  In June, media reported Maduro's minister of defense, Vladimir Padrino López, authorized the promotion of Alexander Enrique Granko Arteaga and Nairobi O'Connor Jackson, two officers whom dozens of victims accused of participating in torture, cruel treatment, and other human rights abuses at the DGCIM.  The OHCHR and FFM collectively recorded hundreds of complaints from victims and relatives detailing human rights violations and abuses, cruel treatment, and torture against political prisoners in SEBIN and DGCIM facilities.

In January, Foro Penal reported more than 50 individuals detained on politically motivated grounds needed medical attention.  Foro Penal highlighted the case of José Javier Tarazona Sánchez, a human rights defender arrested in 2021.  According to Foro Penal and Tarazona's family, Tarazona suffered from chronic conditions that required daily medication,

but prison authorities did not allow access to proper medical treatment.

Impunity for security forces was a significant problem.  There were continued reports of police abuse and involvement in crime, particularly in the activities of illegal armed groups, including illegal and arbitrary detentions, extrajudicial killings, kidnappings, and the excessive use of force. No effective action was taken to investigate members of security forces who committed these and other human rights abuses.  Corruption, inadequate police training and equipment, and insufficient funding, particularly for police forces in states and municipalities governed by democratic opposition-affiliated officials, reduced the effectiveness of security forces. NGOs noted many victims did not report violent crimes due to fear of retribution or lack of confidence in police.

## b. Protection of Children

### Child Labor

The law prohibited all the worst forms of child labor.  The law set the minimum employment age at 14.  Children younger than 14 could work only if granted special permission by the National Institute for Children or Maduro's Ministry of Labor.  Such permission could not be granted to children who were younger than the legal age for work in hazardous occupations that risked their life or health or could damage their intellectual or moral development.  According to the ILO, Maduro representatives did

not publish the list of specific types of work considered hazardous.  Children ages 14 to 18 could not work without permission of their legal guardians or in occupations expressly prohibited by law, and they could work no more than six hours per day or 30 hours per week.  Children younger than 18 could not work outside the normal workday.  Penalties for violators were less than those for analogous crimes.  Anyone employing children younger than eight was subject to time in prison.  Employers were required to notify authorities if they hired a child as a domestic worker.  Maduro representatives did not effectively enforce the law and did not release statistics on the number of children subjected to child labor or on penalties applied against violators.

NGOs asserted the prevalence of child labor continued to increase throughout the country, especially in the mining sector.  In June, the domestic human rights NGO Fundaredes reported children and adolescents were among the victims of forced labor in the Orinoco Mining Arc.  According to Fundaredes, children and adolescents were forced to work in inhuman conditions and suffered from mistreatment by armed groups in Amazonas, Bolivar, and Delta Amacuro States.  Other NGOs reported children as young as seven could be seen in the streets offering to clean vehicles.

## Child Soldiers

The Secretary of State determined Venezuela had Maduro-supported armed

groups that recruited or used child soldiers during the period of April 2023 to March 2024.  See the Department of State's annual *Trafficking in Persons Report* at http://www.state.gov/trafficking-in-persons-report/.

## Child Marriage

The legal minimum age for marriage was 18, or 16 with parental consent. Maduro representatives did not enforce the law effectively.  NGOs noted Maduro representatives did not collect data on child marriage; the NGOs considered such marriages a grave problem.

# c. Protection to Refugees

Maduro representatives did not cooperate with the Office of the UN High Commissioner for Refugees or other humanitarian organizations in providing protection and assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern.

## Provision of First Asylum

The law provided for the granting of asylum or refugee status, and there was a system for providing protection to refugees, although delays in the system allowed for abuse at the hands of private individuals and representatives of the state.

## d. Acts of Antisemitism and Antisemitic Incitement

The Confederation of Israelite Associations in Venezuela estimated there were 10,000 Jews in the country.  Jewish community leaders expressed concern regarding antisemitic statements by Maduro-aligned actors.  On August 2, Maduro claimed "international Zionism" was financing a supposed coup attempt to remove him from power and "international Zionism" controlled "all social media networks, satellites, and power."  Maduro also said he condemned "the most brutal genocide that has taken place after that of Hitler, against the people of Gaza."

## e. Instances of Transnational Repression

### Misuse of International Law Enforcement Tools

There were credible reports Maduro representatives attempted to misuse international law enforcement tools, including INTERPOL Red Notices, to carry out politically motivated reprisals against individuals located outside the country.  On October 24, attorney general Saab in a formal letter solicited an INTERPOL Red Notice for Edmundo González, accusing González of crimes including usurpation of public functions, forging of documents, incitement to disobey laws, and complicity in violence against public peace. On November 7, González published Saab's letter and claimed the action, which González categorized as an attack, came in response to his efforts to garner support in Europe for democracy in Venezuela.